**CITY COM'RS OF PORT ARTHUR et al. v. FANT et al. (No. 186.)**

(Court of Civil Appeals of Texas. Beaumont. Nov. 24, 1916.)

1. EMINENT DOMAIN ⟝2(6) — "TAKING" — EASEMENT IN STREET — CONSTRUCTION OF DRAIN.

The construction by a city of an open drainage ditch along one side of a street of which it owns the fee is not a "taking" of the property of abutting owners within Const. art. 1, § 17, providing that no person's property shall be taken, damaged, or destroyed for public use without adequate compensation, and that, when taken, except for the use of the state, such compensation shall be first made or secured by a deposit of money, but, at most, a damage to such property for which there is an adequate remedy at law, so that injunction will not issue to restrain the construction of the ditch before compensation has been paid to the abutting owners.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 4.

For other definitions, see Words and Phrases, First and Second Series, Taking.]

2. MUNICIPAL CORPORATIONS ⟝321(1)—PUBLIC IMPROVEMENTS—NECESSITY—REVIEW OF DETERMINATION.

Where the proper authorities of a city have determined that a proposed system of drainage is necessary, the questions whether such system is the most feasible or the least expensive cannot be considered by the courts.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 837.]

3. MUNICIPAL CORPORATIONS ⟝323(1) — "NUISANCE"—DRAIN—INJUNCTION.

The construction by a city of an open drainage ditch in a street three feet from the curb line and varying in width up to twelve feet and in depth up to five feet, but which would leave ample room for vehicles to pass in the street, and could be cheaply bridged to give access to adjoining owners, is not such a "nuisance" as would entitle abutting owners who did not own the fee in the street to injunction under Vernon's Sayles' Ann. Civ. St. 1914, art. 4643,

providing for the issuance of injunction in certain cases.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 842, 844, 845.

For other definitions, see Words and Phrases, First and Second Series, Nuisance.]

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Suit by Mrs. J. E. Fant and others against the City Commissioners of Port Arthur and others to restrain the construction of a drainage ditch. Injunction granted, and defendants appeal. Judgment reversed, and injunction dissolved.

Greer, Nall & Bowers, of Beaumont, and A. W. Dycus, of Port Arthur, for appellants. V. A. Collins, of Beaumont, for appellees.

BROOKE, J. Appellees filed their petition in the district court for the Sixtieth judicial district, asking for an injunction, and on September 14, 1916, filed an amended petition on which the case was tried. They alleged that the city of Port Arthur was a municipal corporation, with powers ordinarily incident to such corporations; that it was laid off into lots, blocks, streets, and alleys; that the plaintiffs were the owners of certain lots mentioned in their petition, and the defendant city was constructing a ditch along Eighth street, which interfered with the free access to and from their property; that the construction of said ditch would destroy said property and was the taking of such property without compensation as provided by the Constitution of Texas. They further alleged that said ditch would be a menace and endanger the lives of their children.

The sixth paragraph of plaintiffs' petition is as follows:

"Complainants allege that they each own property on Eighth street and reside thereon, and anything done to Eighth street which would hinder traffic thereon or would in any wise interfere with plaintiffs' free access to their abutting property, or would in any wise interfere with the proper and ordinary use of their easement in said street next to and abutting on their said property, would affect them in a way different from the effect on other citizens and property owners in Port Arthur not owning property on Eighth street, or residing thereon, and more deleterious than such improper use of said street would affect property owners on other streets.

"Complainants own property on said streets as follows: J. P. Fant, lot No. 7 in block 71; R. C. Stevenson, lots 8 and 9 in block 71; Jay Smith, lot 9 in block 72; G. F. Steen, lot 12 in block 72; C. O. Dupuy, lot 11 in block 72; Mrs. F. E. Sturgis, the E. ½ of lot 8 in block 72; B. Christopher, W. ½ of lot 8 in block 72; W. C. Repsonalaeger, lot 7 in block 72; Mrs. Mary Meyers, lot 10 in block 72; A. Haggerty, lots 10 and 11 in block 77; T. J. Belanger, lots 1, 2, and 3 in block 76; A. B. Miles, lot 1 and lot 2 in block 80; W. B. Hendrickson, lot 11 in block 69; G. M. Frost, lot 10 in block 69; T. Carlson, lot 3 in block 81; S. B. Roper, lot 12 in block 67; E. E. Thorn, lot 8 in block 61; James Bradley, lots 1, 2, and 3 in block 75; C. Ray, lot 12, block 68; D. Patterson, lot 7 in block 81; H. J. Pelta, lot 10 in block 71."

---

⟝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

By supplemental petition appellees alleged as follows:

"Now come plaintiffs and each of them named in the first amended original petition filed herein by them, and with leave of the court file this their first supplemental petition, and for reply to defendants' answer filed herein say the nature of the work being done by defendants on Eighth street *in front of the property owned by these plaintiffs* [italics ours], whether by the city commissioners directly or through other agencies, is beyond the power or authority granted to said city commissioners by the city charter of Port Arthur and in derogation of the constitutional rights of these plaintiffs. Wherefore they pray as in their first amended original petition."

Defendants in the court below (appellants here) answered the application for an injunction, and, after demurring thereto, admitted that the city commissioners were engaged in constructing a ditch, and denied that it would destroy plaintiffs' property, or that it would interfere with their access to and from the street if they would construct bridges across said ditch. Defendants further alleged that it was necessary to construct ditches to carry off surface water, and that the city had issued bonds for said purpose and had employed a competent engineer to construct a drainage system; that said ditch was a part of said system, and, after constructing the same in front of plaintiffs' property, there would still be sufficient width for vehicles to pass along said street, and that plaintiffs, by a small expense, could construct bridges across said ditch; that the city had a right to construct ditches for the purpose of carrying off drainage water, and the construction of same was not an additional burden on the street; and that the water would be removed from said ditch by pumps, and no injury would result to plaintiffs' property by reason of the construction of said ditch.

The proof shows the ditches to be constructed and the property owned by plaintiffs to be as follows:

The ditch on the north side of Eighth street from Houston avenue to Ft. Worth avenue is 3 blocks long. The ditch at Houston avenue is less than 2 feet deep. At Ft. Worth avenue it is $4\frac{1}{2}$ feet deep. The ditch is 3 feet wide at the bottom. Where it is 2 feet deep, it is 5 feet wide on the top; and where it is $4\frac{1}{2}$ feet deep, it is $7\frac{1}{2}$ feet wide on the top. The ditch is on the north side of the street and passes blocks Nos. 71, 72, and 73. The ditch extends from Ft. Worth avenue to Texas & New Orleans Railway tracks, a distance of one block, passing in front of block No. 70.

No property owners in block No. 70 sued. Block No. 78 is on the opposite side of the street from the ditch, and no property owner in this block sued. The ditches from Austin avenue to Stillwell boulevard are on the south side of Eighth street. From Austin avenue to Shreveport avenue the ditch is 3 blocks long and passes in front of Blocks Nos. 79, 80, and 81. The ditch is 18 inches deep at Austin avenue and $4\frac{1}{2}$ feet at Shreveport avenue. It is the same width as the ditch from Houston avenue to Ft. Worth avenue.

Lots Nos. 67, 68, and 69 are on the opposite side of the street from the ditch. A ditch extends on the south side of Eighth street from a point between Augusta avenue and Savannah avenue to Shreveport avenue $3\frac{1}{2}$ blocks. It is 8 inches deep at the beginning and 5 feet deep at Shreveport avenue. It passes in front of one-half of block No. 85 and blocks Nos. 84, 83, and Webster school, on block No. 82. Blocks 66, 65, and 64, and one-half of block No. 63, are on the opposite side of the street. This ditch is constructed in an old ditch already along this street. This ditch is the same width as that from Houston to Ft. Worth avenue. There is a ditch beginning at the middle of block No. 85, between Austin avenue and Savannah avenue on the south of Eighth street and extends to

Stillwell boulevard. This ditch passes in front of the east one-half of block No. 85 and blocks 86, 87, and 88. Blocks Nos. 60, 61, 62, and east one-half of 63 are all on the opposite side of the street.

The following parties live on Eighth street on the south side where the old ditch is, and where this ditch would be cleaned out: W. H. Brown, Mrs. Arkade Patin, Mrs. Ada Mouton, Alec Weber, J. E. Waldrip, J. Hooks, and G. O. Shefstead. The following parties live on the north side of the street on the opposite side from where the ditch is being cleaned out: L. H. De Villier, A. Landry, J. W. Morris, Doc Currie, and R. Varnado. It does not appear where the following parties live: Lawrence Whipple, Mrs. N. N. Keith, W. W. Akin, and E. C. Follette.

While the evidence tends to show some of the parties above named lived on that part of Eighth street where the old ditch was heretofore constructed, there is nothing to show what property is owned by the following plaintiffs: R. Varnado, Lawrence Whipple, J. W. Morris, W. W. Akin, Mrs. N. N. Keith, Doc Currie, A. Landry, L. O. O. De Villier, E. C. Follette, and J. Hooks.

The old ditch on the south side of Eighth street is of the following depth and width: At Shreveport avenue it is 10½ feet wide at the top, 3 feet wide at the bottom, and 5½ feet deep. At the middle of block No. 82 it is 12 feet wide at the top, 3 feet wide at the bottom, and 3.7 feet deep. At Atlanta avenue, 300 feet from Shreveport avenue, it is 11 feet on top, 4 feet on bottom, and 3.8 feet deep. At Mobile avenue, 600 feet from Shreveport, it is 10 feet on top, 6 feet on bottom, and 3 feet deep. At Augusta avenue, 3 blocks from Shreveport avenue, it is 9 feet on top, 6 at bottom, and 3 feet deep. At Savannah avenue, 4 blocks from Shreveport avenue and 3 blocks from Stillwell boulevard, it is 8 feet on top, 6 on bottom, and 3 feet deep. At Charleston avenue, 5 blocks from Shreveport avenue and 2 blocks from Stillwell boulevard, it is 6 feet on top, 5 feet on the bottom, and 2 feet deep. At Nashville avenue, 6 blocks from Shreveport avenue and one block from Stillwell boulevard, it is 6 feet on top, 5 feet on bottom, and 2 feet deep. At Stillwell boulevard it is 8 feet on top, 6 feet on bottom, and 2½ feet deep.

The new ditch as being constructed between Shreveport avenue and Stillwell Boulevard along the south side of Eighth street will not be as wide as the old ditch, nor any deeper, except toward Stillwell boulevard, where it will be 4½ instead of 2½. The ditch would be constructed 4 feet from the curb line. Eighth street is 40 feet wide from curb to curb, and after the ditch was constructed this would leave 29 feet of Eighth street undisturbed along which travel could pass.

There is testimony, probably undisputed, that a wooden bridge could be constructed over the ditch at any point on Eighth street from 10 to 12 feet wide at from $20 to $25. There were 146 residences on Eighth street, and only 37 plaintiffs sued. The other 109 property owners are not complaining.

The case was heard before the court, and the court granted a temporary restraining order restraining defendants from cutting the open ditch in front of plaintiffs' property and ordering the city to fill up the ditch, but suspended the order pending appeal. The defendants were also enjoined from interfering with the old ditch or working on it in any manner, and they were required to leave it in the condition in which it is at the present time.

Defendants below (appellants here) filed their motion for a new trial on the following grounds:

(1) That the evidence did not show that H. J. Pelter and 17 other plaintiffs owned any property on Eighth street along which the ditch was being constructed.

(2) That a large number of plaintiffs owned property on the opposite side of the street from which the ditch was being constructed.

(3) That the old ditch from Shreveport avenue to Stillwell boulevard was only to be cleaned out and part of it filled up, and said work was not an additional burden on said street.

(4) That the city commissioners were authorized to determine the character, locality, and kind of ditch necessary, and the ditch being constructed on Eighth street was not an additional burden on the street entitling the plaintiffs and abutting owners to compensation before the ditch was constructed.

(5) That the city commissioners of the city of Port Arthur had jurisdiction to determine the size and character of ditches to be constructed in front of plaintiffs' property, and such action was a judicial duty to be determined by the city commissioners, and not by the court.

(6) That the construction of said ditch was not the taking of the property within the Constitution entitling plaintiffs to compensation before said ditch was constructed.

(7) That the court should not have required the defendants to fill up the ditch on Eighth street, and prohibited the defendants from constructing any portion thereof, irrespective of the exercise of the discretion vested by law in municipal authorities to determine the kind and character of drainage in view of the funds available for such purposes.

(8) That the city had authority under its charter powers to construct the ditches, and that plaintiffs still had access to their property by constructing bridges across said ditch at a small cost, and the street was still wide enough to permit the unobstructive passage of vehicles up and down the same, and the court should not have interfered with the right of the city commissioners to construct

said ditch in the absence of proof of unreasonableness showing that the city commissioners were abusing their discretion.

(9) The court should not have granted the injunction because the plaintiffs had an adequate remedy at law, and the construction of the ditch was not an additional burden on the property of plaintiffs requiring compensation before the property was taken, and those who own property on the opposite side of the street had no claim at all, merely a claim for damages, and the construction of the ditch adjacent to the property owned by some of the plaintiffs was merely a lawful use of the street for the purposes for which it was dedicated.

The court filed his findings of fact and conclusions of law, and found that the city of Port Arthur was located on a low level plain, subject to overflow, and it was necessary to drain said city, that after the storm of 1915 the city commissioners employed a competent engineer and called a bond election, which was carried, and they adopted a system of drainage, setting out at length the plan, and that the construction of this plan called for a ditch in front of plaintiffs' property, but that the construction of this ditch was a nuisance, and was the taking of plaintiffs' property without due process of law.

The court also found that the construction of the ditch of Eighth street was a feasible plan of drainage and would accomplish the purpose for which it was intended, but that the city could be drained without constructing this ditch and constructing ditches on other streets.

The court concluded as a matter of law that the construction of the ditch was the taking of plaintiffs' property without compensation being made in advance as provided by Constitution, that a suit for damages would be inadequate, and that therefore the plaintiffs were without an adequate remedy at law, and the court further concluded that, even if there was a remedy at law, still, the plaintiffs being entitled to recover damages, they could also enjoin on this ground. Appellants excepted to these conclusions.

After the conclusions of law and findings of fact were filed, defendants filed some additional assignments of error, complaining of the findings of the court that the ditches were a nuisance on plaintiffs' property, and deprived them of the free access to and from their property; that the court erred in finding that the ditches were an additional burden on the street and the construction of the same was the taking of property without due process of law; that the court erred in his conclusion of law because plaintiffs had an action of law for damages entitling each of them to an injunction; that the court erred in issuing an injunction in favor of all of the plaintiffs, because some of them did not own property on this street, and some who did own property owned on the opposite side of

193 S.W.—22

the street from which the ditch was being constructed.

The facts are undisputed that Port Arthur is a municipal corporation, having duly elected city commissioners; that they laid out a drainage system, and a bond issue was carried for the purpose of constructing drainage, and the city commissioners determined as a part of this drainage that a ditch should be constructed along Eighth street, on which some of the plaintiffs own property, and that there was an old ditch on a part of Eighth street which should be filled up in places and straightened so it would not be as large in some places, but deeper in others.

The evidence also shows that the plaintiffs in front of whose property the ditch is being constructed who can be located are those owning property in blocks Nos. 71, 72, 80, and 81, and the defendants are enjoined not only from constructing a ditch in front of those blocks, but in front of blocks Nos. 70 and 73, and cleaning out the old ditch in front of blocks Nos. 79 to 88, inclusive.

In order that a more comprehensive idea may be had of the location of the city and the proposed drainage system, the following map is appended to and made a part of this opinion:

We have heretofore set out the exact language with reference to the ownerships of the plaintiffs to the land pleaded in the court below. It will be noted that in the pleadings no claim is set out or made claiming or showing ownership of the fee-simple title in any of the appellees to any portion of the street. The stipulation of counsel in the statement of facts with reference to the proof on this proposition is as follows:

"It is agreed, for the purposes of this trial, that the ownership of the property as plead by the plaintiffs in their original petition is correct, and that they own all the property they claim."

In this case it is further shown that the city of Port Arthur is situated in low, flat, level land, rising from sea level to approximately an altitude of 4 or 5 feet above this level on the shore of the government canal; that the city is subject to tidal waves and disturbances of the sea by water in time of storms; that the city property takes in an area of some 2,600 acres; that in the locality of Port Arthur there has been rainfall as much as 48 inches in one year, and that it is not infrequent to have a rainfall of from 4 to 6 inches in 24 hours; that the storm or tidal wave of August, 1915, completely submerged the city with salt water, and water remained on the ground and in the buildings for some two or three weeks; that in its present condition the city of Port Arthur has a wholly inadequate drainage system; that the city is susceptible of a first-class drainage system that would insure not only against water from the sea, but also against the rainfall; that the city of Port Arthur, acting through its commissioners, the city being un-

der commission form of government, in September, 1915, inaugurated a plan for the purpose of establishing drainage, and that the city, as such, is clothed with power by the Legislature to plan and construct necessary drainage; that the proper ordinances and resolutions were prepared and passed by the city commissioners; that a bond election was duly held and carried, and bonds were issued in the sum of $180,000 for drainage purposes; that the city commissioners employed one J. F. Coleman as engineer to lay off the city so as to drain the same properly, and that said engineer reported fully, having made and completed a set of plans for drainage, giving the details of the work to be done, which was necessary for adequate drainage, as shown by Exhibit B, hereto attached; that these plans and specifications call for a complete levy around the entire city, so as to keep out from the city limits all foreign water, that is to say, water that does not fall in the city limits in time of rains. The city proposed to construct in some places large reservoirs, and in others small ditches leading into the reservoirs, and to rig the reservoirs with pumps to draw the water outside the city limits. In some cases almost the entire street was occupied by these reservoirs, and in others small ditches, ranging from 1 foot to as much as 4 feet deep and from 2 feet wide to 7½ feet wide were proposed to be constructed. Along Eighth street there is a system of ditches proposed to be constructed ranging from 18 inches to 4½ feet deep and from 5 to 7 feet wide. The greatest length of any one of these ditches is three blocks, some of them being only one block, and are for the purpose of intercepting the flow of water and to congregate it into reservoirs more quickly and keep it from overflowing the residence part of the city adjoining or contiguous to Eighth street. The ditch to be constructed on Eighth street does not touch the property owned by any one of the plaintiffs in this case. The sidewalk intervenes between the property line and the street 10 feet in width, and then 3 feet is left between the sidewalk line and the inner edge of the ditch, thus making the ditch 3 feet from the sidewalk line out in the street.

The vital proposition in the adjudication of this case is whether the cutting of a ditch on Eighth street in the city of Port Arthur in the manner in which is contemplated by the city is a taking of the property of plaintiffs, or either of them, for public use, within the meaning of the Constitution of the state of Texas, requiring compensation to be first paid before the property is taken, or is it merely a damage to the property of the plaintiffs, not requiring compensation to be made before the work is done? This requires earnest and deep consideration; for upon the settlement of this depend the entire rights of the parties in this case.

Article 1, § 17, of the Constitution of the state of Texas reads as follows:

"No person's property shall be taken, damaged or destroyed for, or applied to, public use without adequate compensation being made, unless by the consent of such person; and when taken, except for the use of the state, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities shall be made; but all privileges and franchises granted by the Legislature, or created under its authority, shall be subject to the control thereof."

An exhaustive inquiry as to what is meant by the word "taken," as used in the article of the Constitution above quoted, in the light of decisions of this state especially, should be made, and as the exact question, perhaps, has not been decided with reference to ditches excavated in streets, analogous questions have arisen, and will shed much light, and indeed should be and are decisive of the question in this case. These cases will be extensively examined.

In the case of Gray v. Dallas Terminal Ry. & Union Depot Co., 13 Tex. Civ. App. 158, 36 S. W. 354, in speaking of the construction of a railway line over a street, with reference to the question of whether it was deemed "taken," not from owners of the fee-simple title in the street, but from the owners of abutting property, the court says:

"If the owners of a majority of front feet, exclusive of street intersections, along said streets, were willing, then the city council had the exclusive right to grant the privilege to the railway company to construct its line of railroad along such streets; but it is contended by appellants that, although the construction of the line along the streets does not take any part of the lot owned by the several owners, yet, inasmuch as it takes away part of their easement in such streets, this is such a taking of property under the Constitution that the railway company will be compelled to pay such damages before it can be taken. This position cannot be maintained under the authorities. Our Constitution (article 1, § 17) provides: 'No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and when taken, except for the use of the state, such compensation shall be first made, or secured by a deposit of money.' Under this section of the Constitution, does the appropriation of the right of way over the streets named, with the consent of the city council, the owners of a majority of front feet, exclusive of street intersections, being willing, constitute a taking of property, so that it is necessary that payment shall be first made before such right of way can be used? It is so stated in the opinion of our Supreme Court in the case of Railway Co. v. Fuller, 63 Tex. 469. The right of way had been granted by the city of Houston over St. Emanuel street. The court said: 'The word "property," as used in the section of the Constitution referred to, is doubtless used in its legal sense, and means not only the thing owned, but also every right which accompanies ownership, and is its incident. Thus considered, under the rules established by the great weight of judicial decisions and opinions of elementary writers eminent for their learning, the facts of this case amount to a taking of private property for public use. * * * If, however, there has been no taking of the property of the appellee within the meaning of the Constitution, there can be no doubt that it has

been damaged,' etc. That case was a suit for damages by the appellee after the road had been constructed and operated over the street, and involved the question of damages only. The question of the taking of private property was not involved in the case, and we do not think the court intended the above argumentative statement as an authoritative settlement of the question. On the contrary, subsequent opinions of the Supreme Court seem to point to a different conclusion. In the case of Railway Co. v. Hall, 78 Tex. 172, 14 S. W. 259 [9 L. R. A. 298, 22 Am. St. Rep. 42], Judge Gaines, in referring to the Fuller Case, above, says: 'In Gulf, Colorado & Santa Fé Ry. Co. v. Fuller, 63 Tex. 467, damages were allowed the plaintiff for an injury to his property resulting from the construction and operation of the defendant's railroad along a street in front of his lots. The plaintiff having an easement in the street peculiarly essential to the full enjoyment of his property, the court held that the appropriation of the street was a taking within the meaning of the Constitution. But the court also say: "If, however, there has been no taking of the property of the appellee within the meaning of the Constitution, there can be no doubt that it has been damaged, if the evidence offered to support the averments of the petition be true. The word 'damaged' is evidently used in the sense in which the word 'injured' is ordinarily understood. By damage is meant every loss or diminution of what is a man's own, occasioned by the fault of another, whether this results directly to the thing owned or be but an interference with the right which the owner has to the legal and proper use of his own. If by the construction of a railway or other public work an injury peculiar to a given property be inflicted upon it, or its owner be deprived of its legal and proper use, or of any right therein or thereto—that is, if an injury not suffered by that particular property or right in common with other property or rights in the same community or section by reason of the general fact that the public work exists be inflicted—then said property may be said to be damaged." We think the language quoted from the opinion in the Fuller Case lays down the true rule.' The court indorses the portion quoted which holds that the property owner may be entitled to damages, but does not seem to indorse the portion which holds that such use of the public street is a taking of private property for public use. In the case of Rosenthal v. Railway Co., 79 Tex. 327, 15 S. W. 268, which involved the construction and operation of a railway in front of appellant's property over a public street in La Grange, the consent of the municipal authorities having been obtained, the court said: 'The company lawfully acquired the right to operate the road along the street, subject, however, to that provision of the Constitution which secures indemnity to those whose property is damaged for a public use.' This case, we think, clearly announces the correct doctrine, and is supported by the weight of authority. To place the power in the city council to give consent (the property owners being willing) for a railway company to construct its line along the public streets would avail nothing if it was necessary for it to condemn the right of way and pay damages to every abutting property owner before the franchise could be made available. But the rule announced in the Rosenthal Case that, when the consent of the city council is properly granted, the company has lawfully acquired the right to operate its road along the street, subject to any lawful claims for damages to the property owner, is in harmony with the Constitution and the statutes under it. Const. art. 1, § 17; Sayles' Civ. St. art. 4173; Osborne v. Railway Co., 147 U. S. 259, 13 Sup. Ct. 299 [37 L. Ed. 155] Railway Co. v. Lougorio, 25 S. W. 1022. A different question might be presented in a case where the title to the street itself was in the abutting property owner. This suit does not involve a question of damages, but is based purely upon the equitable remedy by injunction; appellants denying the right of appellee to construct its railway along the streets named. If appellee has obtained the consent of the city council, the owners of the majority of front feet, exclusive of street intersections, being willing, it has acquired the legal right to construct and operate its road, and the question of damages to an abutting property owner is one which can be settled hereafter. The court will not enjoin merely because some one may be damaged. It is well said by Chief Justice Fuller, in the Osborne Case, above: 'But where there is no direct taking of the estate itself, in whole or in part, and the injury complained of is the infliction of damages in respect to the complete enjoyment thereof, a court of equity must be satisfied that the threatened damages are substantial, and the remedy at law inadequate in effect, before restraint will be laid upon the progress of the public work. And if the case made discloses only a legal right to recover damages, rather than to command compensation, the court will decline to interfere.' Cooper v. Dallas, 83 Tex. 242, 18 S. W. 565 [29 Am. St. Rep. 645]; Chicago v. Taylor, 125 U. S. 164, 8 Sup. Ct. 820 [31 L. Ed. 638].

"It is contended in the very able brief and argument of appellants that the case of Railway Co. v. Jennings, 76 Tex. 373, 13 S. W. 270 [8 L. R. A. 180], is authority upon the proposition that a court of equity should interfere by injunction to restrain a railway company from appropriating a right of way under such circumstances. A careful examination of that case will show that it does not establish the proposition. In that case appellee had granted the right of way over his land to the Texas & Pacific Railway Company, reserving the fee in himself. That company, having constructed its road on the right of way designated, undertook to transfer a part of its right of way to another company, which sought to fix upon the land this additional servitude, without the consent of the owner. Jennings not only owned the adjacent property, but owned the fee in the roadbed itself, and was entitled to an injunction to prevent the latter company from taking his property without just compensation being first made. The question there involved was a very different one from this."

In the case of Rische v. Texas Transportation Co., 27 Tex. Civ. App. 34, 66 S. W. 325, Judge Fly handed down a very able and exhaustive opinion, saying:

"Appellant alleged, in substance, that he was the owner of certain lots in the city of San Antonio, at the corner of Grant avenue and River avenue, and fronting on both streets; that in September, 1897, appellee constructed on said streets a street freight railway, and is operating the same, and that this was done by virtue of a charter obtained from the state of Texas, and under an ordinance duly enacted by the city of San Antonio granting a franchise to appellee to operate such railway. It was further alleged that heavy iron T-rails were used in constructing the track; that there is another railway track on said streets and two trolley wires; that heavy electric motors have been placed on the track in question, and are being operated in transporting large refrigerator cars used by railroad companies for transporting beer; that appellee runs from four to six trains daily, which are composed of from three to fifteen cars in addition to the motor car; that such use is an additional servitude on said streets, and is a continuing nuisance and trespass; that in the construction of the road appellee has not occupied the center of the street, but has constructed its track within six feet of appellant's sidewalk, thereby rendering access to his residence dangerous and inconvenient, and appel-

lant has been forced thereby to abandon the front entrance to his house; that the cars make great noise, and jar and shake his house, and the cars are run so rapidly as to endanger the lives of his family and other persons using the streets. Damages were prayed for, and an injunction against the further operation of the road.

"It has been held by this court, and the ruling approved by the Supreme Court, that the railway being operated by appellee is for public purposes. Mangan v. Transportation Co., 18 Tex. Civ. App. 478, 44 S. W. 999. The Constitution of Texas (article 1, § 17) provides that: 'No person's property shall be taken, damaged, or destroyed for, or applied to public use, without adequate compensation being made, unless by consent of such person; and when taken, except for the use of the state, such compensation shall be first made, or secured by a deposit of money.' At the time this constitutional provision was adopted the rule seemed to be that the word 'taken,' as used in Constitutions in this connection, should be confined to an actual taking of property, and that damages incurred by the owner of property indirectly or consequentially could not be recovered. The constitutional provision was undoubtedly enacted to meet this construction. Railroad Co. v. Eddins, 60 Tex. 656; Railway Co. v. Meadows, 73 Tex. 32, 11 S. W. 145, 3 L. R. A. 565. It follows from the constitutional provision that, if the use of the streets by appellee for the purpose of transporting freight from one point to another in the city of San Antonio imposes an additional servitude on the streets—that is, puts them to a use not contemplated in their dedication and construction—appellant is entitled to compensation for any damages that he may have sustained by such use of the streets; and if there was a 'taking' of his property, as contemplated by the Constitution, appellee should, in the absence of condemnation proceedings and compensation paid or secured, be restrained from such use of the streets. Whatever may be the enlarged scope given in definitions by courts to the word 'taken' when used in Constitutions in connection with the taking of private property for public uses, the Constitution of Texas has in the provision hereinbefore copied confined it to its ordinary use, and it must be held to mean an actual 'taking' in the physical sense of the word; damages arising from anything else than an actual taking being fully provided for in the section quoted. Keeping in view that the makers of the Constitution were using the word 'taken' in the sense of an actual physical appropriation, it is clear that when it provides that compensation shall be made or secured before the property is taken it has no reference to a case where property is damaged or destroyed, and one who has merely damaged property without actually appropriating it cannot be restrained from the use causing the damage because he had not made arrangements for compensation before use was begun. What we have said would seem to be in conflict with some expressions in the case of Railway Co. v. Fuller, 63 Tex. 469, where it was held that operating a railroad along a street was a 'taking,' and that, whether taken, damaged, or destroyed, compensation must be first made. These expressions were not necessary to the proper decision of the case before the court, and consequently cannot be binding as a precedent. No injunction was sought; the injured party merely suing for damages. The expressions referred to in the Fuller Case, appear to be in conflict with the case of Railroad Co. v. Odum, 53 Tex. 353, where it is held that 'the regulation or enlargement of the use of the street, the property of the state, is not a taking of property within the meaning of the Constitution of 1869, although the lot owner may thereby suffer incidental inconvenience or injury.' The Constitution of 1876 used the word 'taken' in the sense that it was used in former Constitutions and as defined by judicial interpretation, and then provided for damages not expressed in former Constitutions. It is clear that neither the Legislature nor city council could authorize the taking of private property in any other than the constitutional way, but the Legislature has the power to authorize acts for the public good that might result in damage to the individual without requiring as a condition precedent that all damages should be first paid. The Legislature, having the power to do so, has granted the right to obtain charters to operate street railways for the carriage of passengers or freight, and, appellee having obtained a charter under authority of the statute, and the city of San Antonio, to whom exclusive control of the streets has been given by its charter, having given permission to appellee to lay its track and operate cars on certain streets, it is acting under lawful authority, and, having built its road properly, it cannot be a public nuisance, and an injunction should not be granted. There is no allegation that appellant owned the fee in the street; the only allegation on this point being the argumentative one that appellant owned the fee to the center of the street because he owned the abutting property, which does not follow. If he had alleged, however, that he owned the fee, and had granted the land to the city for street purposes alone, it would not alter the case presented by the record. The street is a public highway, and, no matter who owns the fee, the public easement is superior to the right of the individual. As said in Halsey v. Railway Co. [47 N. J. Eq. 380] 20 Atl. 859, by the Court of Chancery of New Jersey: 'Lands taken for streets are taken for all time, and, if taken upon compensation, compensation is made to the owner once for all. * * * The authority to use a public highway for the purpose of a railroad, retaining the use of such highway for all ordinary purposes, subject only to the inconvenience of the railroad, is not such a taking of private property from the owner of the adjacent land as is prohibited by the Constitution.' It is not denied that appellee was authorized by its charter to operate a railroad for the transportation of freight, but, on the other hand, it is alleged that the charter for such purpose was granted under title 21, c. 2, of the Revised Statutes of Texas, and that an ordinance was duly enacted by the city of San Antonio granting a franchise to build such road, and that by virtue of such charter and such ordinance the road was built. The Legislature having the power to grant such charter, and the city being empowered to pass such ordinance, the injunction prayed for was properly denied.

"The injunction was also properly denied because the injury was not shown to be irreparable, and, if any case at all was made out by the allegations, it was only a right to recover damages, and not one to demand compensation. As said by the Supreme Court of the United States in D. M. Osborne & Co. v. Missouri Pac. R. Co., 147 U. S. 248, 13 Sup. Ct. 299, 37 L. Ed. 155: 'Where there is no direct taking of the estate itself, in whole or in part, and the injury complained of is the infliction of damages in respect to the complete enjoyment thereof, a court of equity must be satisfied that the threatened damage is substantial, and the remedy at law in fact inadequate, before restraint will be laid on the progress of a public work.' There is no law in Texas for condemnation proceedings except in cases where lands are actually taken by railroads, and it cannot with force be contended that condemnation proceedings should be resorted to before the street could be used for the purposes intended. There being no provision for condemnation, it would seem clear that it is a case where the only way open to appellee was pursued, and appellant would be relegated to a suit for any damages he may have

sustained. The question, then, arises as to whether appellant is entitled to damages arising on account of the construction and operation of the railway. If the railway in question can be classed as a street railway in contradistinction to a commercial railway, then, under the general doctrine of the courts of this and most of the other states of the Union, appellant would not be entitled to damages on the ground that streets can be legitimately used by street railways, whatever the motive power, if they are properly constructed. Railway Co. v. Limburger. 88 Tex. 79, 30 S. W. 533, 53 Am. St. Rep. 730; Lewis, Em. Dom. § 115h; Halsey v. Railway Co. [47 N. J. Eq. 380] 20 Atl. 859; Rafferty v. Traction Co. [147 Pa. 579] 23 Atl. 884, 30 Am. St. Rep. 763; Nichols v. Railroad Co. [87 Mich. 361] 49 N. W. 538, 16 L. R. A. 371. The question then arises: What is a street railway, and can the railway of appellee be placed in that class? It was first held that street cars drawn by horses, and used for the transportation of passengers from one part of a city to another, did not constitute an additional servitude on the streets. They were distinguished from steam railways in the rails and construction of the track, the speed at which they run, the noise and vibration produced, the smoke and steam emitted, the danger of frightening horses, the danger to life, and the size and weight of cars and locomotives. When the steam motor and electric cars were invented all the reasons given why horse railways were not an additional servitude to streets were ignored, except that they must be carriers of passengers, and not of freight, from one point to another in a city. In one instance, at least, this last reason has been discarded, and it has been held that the streets can be used by railways whatever be the motive power, and for the carriage of both freight and passengers. Montgomery v. Railway Co., 104 Cal. 186, 37 Pac. 786, 25 L. R. A. 654, 43 Am. St. Rep. 89. The weight of authority, however, is that a street passenger railroad, laid on the surface or established grade of a street, is a legitimate use, while all other railroads are not. Lewis, Em. Dom. § 1151; Elliott, R. R. §§ 6, 557; Funk v. Railroad Co. [61 Minn. 435] 63 N. W. 1099, 29 L. R. A. 208, 52 Am. St. Rep. 608. There has been no direct adjudication of this matter in this state, but there are several cases where damages have been allowed which have resulted from the construction of railroads along streets, and this could have been done only on the theory that they were an additional servitude to the street. Railway Co. v. Eddins, 60 Tex. 656; Same v. Bock, 63 Tex. 245; Railway Co. v. Meadows, 73 Tex. 32, 11 S. W. 145, 3 L. R. A. 565; Same v. Fuller, 63 Tex. 467; Same v. Jennings, 76 Tex. 373, 13 S. W. 270, 8 L. R. A. 180. The railroads in question in the cases cited were steam railroads, but, as we have shown, this would not distinguish them from street railways, which may be operated by any motive power, and the decisions must be justified on the ground that the roads were the carriers of freight, which is all that distinguishes the commercial railway from the street railway. * * *

"In the case of Aycock v. Association [26 Tex. Civ. App. 341] 63 S. W. 953, the identical points involved in this suit was passed upon by this court, and it was held that, 'the use of the streets being one authorized by law, and consistent with the purposes for which streets exist, plaintiffs were not entitled to have such use restrained by injunction, or declared a nuisance.' The Supreme Court refused a writ in the case, and must necessarily have been of the opinion that the language above quoted was the law. The street railway against which an injunction was sought in that case is the one against which it is sought in this case. It is immaterial whether appellee has any authority to exercise the power of eminent domain or not. If it had

all the power with which it is possible to invest any railroad corporation, it could not condemn a street, but must enter upon it through the permission of the city that exercises exclusive control over it. If in doing this it has damaged appellant in a manner not common to all the property holders along the street, it must respond in damages for so doing, but it cannot be restrained from a use of the street sanctioned by the Legislature of the state and permitted by the city council of the city of San Antonio."

In the case of Settegast v. H., O. L. & M. P. Ry. Co., 38 Tex. Civ. App. 630, 87 S. W. 200, the court, through Judge Gill, held as follows:

"In disposing of the questions, Judge Gaines, for the Supreme Court, announced the law to be that the title to the easement over the land taken could not pass until compensation was first made therefor, as required by the Constitution; that the reduction of plaintiff's claim * * * to a judgment against the first company was not a payment nor an abandonment of his title; and that, as the title thus remained in plaintiff, it did not pass by the foreclosure. The purchasing company was therefore held liable for the judgment; it being also held that, as the amount had been adjudicated between the plaintiff and the first company, the judgment was the measure of the recovery. This is unquestionably the law in this state as to property actually invaded and appropriated or 'taken,' in the sense in which the word is used in article 1, § 17, of our Constitution. The doctrine is sought to be extended to cases like the one under consideration, where property rights are damaged by the lawful construction and operation of a railway over a public street. To this end certain expressions of Judge Stayton in Railway Company v. Fuller, supra, are invoked. In that case, as in this, the plaintiff sought to recover for damages sustained by abutting property due to the lawful construction and operation of a railroad on a public street. The suit was resisted on the ground that no such action was maintainable under the Constitution and laws of this state. Article 1, § 17, under which the action was brought, is as follows: 'No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person, and when taken except for the use of the state such compensation shall first be made or secured by a deposit of money. * * *' It thus appears that the sole question up for decision was whether the damages claimed by the plaintiffs were such as were contemplated by the provision of the Constitution supra. It was noted by the writer of that opinion that the word 'damaged' was doubtless added to the section quoted to correct evils which had resulted from a too-restricted definition of the word 'taken.' It is true the writer says the word 'property' is doubtless used in its legal sense, and means not only the thing used, but every right which accompanies ownership and is its incident, and declares that, thus considered, the facts amount to a taking of private property for public use, in which event compensation must first have been made or secured by a deposit of money. If the doctrine thus broadly stated obtained in this state, then abutting owners could enjoin a railway company from constructing a line over a street until compensation was ascertained and made for the injurious effect upon their property—a doctrine which has been distinctly repudiated in Rische v. Transportation Co. [27 Tex. Civ. App. 33] 66 S. W. 325, which met the approval of our Supreme Court. The true ground upon which Fuller's Case, supra, was decided was that the word 'damaged,' included in the present Constitution, broadened the scope of the provision as embodied in former Constitutions of this state. This is evidenced by the fact that

the learned justice in the course of the opinion cast some doubt upon the expressions used in the first part of it by saying that if there had been no taking the property was unquestionably damaged, and declares the word 'damaged' is used in the sense of 'injured.' This is followed by an accurate definition of the word 'damage,' and he cited the case of Railway v. Eddins, 60 Tex. 656, in which the distinction is clearly made, and the rules governing the rights of parties in such cases are accurately laid down. The portion of the opinion in Fuller's Case, supra, relied on by appellant, has been followed in no case in this state to which we have been cited or of which we are aware. On the other hand, in Railway v. Hall, 78 Tex. 169, 14 S. W. 259, 9 L. R. A. 298, 22 Am. St. Rep. 42, the Supreme Court, in an opinion by Justice Gaines, held that the action was for damages, and not for compensation for a taking. The distinction was peculiarly necessary in that case, because the plaintiff was suing for damage to property not abutting on any street or highway, the damages claimed resulting from the operation of a railroad over private property adjoining that of the complainant, the right of way of the company neither invading nor touching the property so damaged. The right to recover was upheld. In the case last cited Railway v. Fuller, supra, was construed as we construe it, and it was declared that the language of the Constitution was broad enough to give the owner a right of action if his property, though not taken, was damaged either by the construction or operation of the road. It is therefore clear that the case does not sustain the contention of appellant, and that the rule announced in the Ortiz Case [75 Tex. 602, 12 S. W. 1129], supra, must be confined to cases in which there is an actual taking.

"We are of opinion, therefore, that the insertion of the word 'damaged' in the Constitution was made in order that persons suffering damage from the lawful construction and operation of public or quasi public works might have their action for damages, though the acts complained of might not come within the definition of the word 'taken,' and that the insertion of the word conferred a right which by reason of the legislative grant to do the acts complained of had not theretofore existed. The right thus conferred was the right to sue for damages for the injury suffered, and not the right to arrest the progress of the work until compensation was made or secured. We are supported in this conclusion not only by the nature of the evil designed to be met by the insertion of the word, but by the fact that in the section of the Constitution in which the word occurs a distinction is made. For damage suffered compensation is allowed, though the property be not taken. But, if taken, except for the uses of the state, compensation must first be made or deposited. In the one case the railway company may be enjoined until the Constitution is complied with, and acquires no right until the compensation is made. In the other the railway company may proceed with its work, the consent of the city having first been obtained, and the person suffering damage thereby is relegated to the courts to enforce his claim as in any other civil action. He cannot enjoin, and this is true whether the abutting owner holds the fee to the street or merely the incidental right to its use. This point is so fully covered by the able and well-considered opinion in Rische v. [Texas Transp.] Co., supra, we deem it unnecessary to discuss it further."

In the case of Burton Lbr. Corp. v. City of Houston, 45 Tex. Civ. App. 368, 101 S. W. 825, the opinion of which was written by Judge Pleasants, the following language is used:

"The first proposition advanced under this assignment is: 'Where railroad companies take and damage property in the construction of a tunnel under the tracks of the railroads, testimony of a witness that benefits from the tunnel offset the damages is inadmissible, and the admission of such testimony over objection is reversible error.' This proposition is not sound, because it makes no distinction between the taking of property and damage to property. If property is actually taken for public use, the owner must be compensated therefor, and no benefit which the owner may receive from the public use to which his property is subjected can be set off against the value of the property so taken. A different rule applies where the dominion of the owner over the property is not invaded, but the property is damaged by the construction and maintenance of public works or ways; and in such case the special benefits to the owner's property accruing from the public improvement can be offset against any damage caused thereto by such improvement. This distinction between taking and damaging property was pointed out in the case of Settegast v. Railway Co. [38 Tex. Civ. App. 623] 87 S. W. 197, 12 Tex. Ct. R. 539, and was the basis of the judgment of this court affirming the judgment of the trial court. A writ of error in that case was denied by the Supreme Court, and the opinion therein stands as authority on this point. The Texas cases cited by appellant do not support its proposition, as in all of them the right of the defendant to offset damages to abutting property caused by the lawful improvement of a street by a city or its use for right of way by a railroad company by benefits shown to have accrued to the property by such public improvement or use is expressly recognized and enforced. Railway Co. v. Fuller, 63 Tex. 472; City of Dallas v. Kahn, 9 Tex. Civ. App. 25, 29 S. W. 98. Authorities sustaining the proposition that in suits of this character the benefits accruing to the property should be considered in estimating the damages are too numerous to require further citation. There is no contention that the evidence shows any actual invasion by defendants of plaintiff's property. If it be conceded that plaintiff, as an abutting owner, is at least prima facie the owner of the fee in a portion of the street, such ownership would extend only to the center of the street, plaintiff not being the owner of the abutting property on both sides of the street, and the undisputed evidence shows that the improvements complained of do not encroach upon that half of the street lying next to plaintiff's property."

In the case of McCammon & Lang Lbr. Co. v. Ry. Co., 104 Tex. 11, 133 S. W. 248, 36 L. R. A. (N. S.) 662, Ann. Cas. 1913E, 870, in that opinion it will be noted that it is expressly held that in the Rische v. Texas Transportation Co. and Settegast v. Railway Co. and Gray v. Dallas Ter. Co. and in the Burton Lbr. Co. v. City of Houston Cases that the Court of Civil Appeals in all four cases, in deciding the real point of issue, correctly held that:

"*Those kinds of injuries that result to those owning lots abutting on streets but not owning the fee of the land in the streets from railroads thereon are not the taking, but the damaging, of the property.*" (Italics ours.)

The larger part of the opinion of Judge Williams in that case, which it would be instructive to carefully read, is as follows:

"The contention of counsel for the plaintiffs is that the proposed use of the street and alley would be a taking of their property without compensation first paid as required by the Constitution. This is denied by counsel for defendant, who insist that such use of property already dedicated to such purposes would not be a taking of it, and would, at most, be only a damaging of plaintiffs' abutting lots for which compensation

in advance is not required. The decision, therefore, necessarily depends on the question whether or not the petition shows a threatened 'taking.' While the Constitution provides that, without consent of the owner, his property shall not be 'taken, damaged or destroyed' without compensation, it further says that, when it is taken, 'compensation shall be first made or secured by a deposit of money.' The distinction is thus made by the Constitution itself between taking and damaging, etc., which becomes important when the aid of equity is invoked to prevent action merely threatened. If such action will constitute a taking, the facts that it is without consent and that compensation has not been made, render it unlawful so that the property owner has the right to prevent it by injunction. If it will constitute only a damaging, the attempt is not necessarily unlawful merely because compensation is not made in advance; and, if equity will prevent it at all, it will do so only upon the showing of additional facts. It is unnecessary to discriminate between the street and the alley as the decision will apply to both.

"It should require only a proper regard for plain physical facts to bring the mind to the conclusion that the location of a railroad, like that of defendant, upon land in which the public have only the easement of a highway and another has the fee, is a taking of that part of the land occupied by the track, at the very least, and hence a taking of property of the owner of the fee. No one disputes that this is the legal effect of such an appropriation of land not burdened with such an easement; for by the construction and use of the railroad the land is actually occupied, and necessarily, to a greater or less extent, the owner is excluded from that complete and exclusive use and control to which his ownership entitles him. Is it otherwise, except in degree, when, instead of only one, there are two interests in the soil to be considered, the public easement and the fee? Is not the land appropriated and used in that case in the same way and for the same purposes as in the other? In both instances the railroad company actually occupies and uses the soil itself in the assertion of a right of way in and over it. Is there a taking in one instance, and not in the other? To make so fundamental a distinction is to deny to the visible facts their necessary consequence. Where, before such occupation of the street, the public, including the owner of the fee, had the use of the highway equally and in common, unimpaired by any appropriation of any part of it to an exclusive use, after such occupation the part actually occupied is to a large extent withdrawn from other uses than those of the railroad company. It is true that such a taking is not entirely from the owner of the fee. The easement of the public is also invaded and taken, at least, to the extent that the highway is actually occupied; but to that extent also the soil belonging to the owner of the fee is taken. The legally authorized consent of the public to such use of the easement makes it lawful, but does not make it any the less a taking, nor justify the taking of that which does not belong to the public—the fee. It is true also that the appropriation of part of the land in a street as a way for a railroad does not so completely exclude the public from its use, theoretically at least, as does such an appropriation of land unaffected by any such public use; for the public may still enjoy the street. as best they can, consistently with the presence of the road. As one of the public, the owner of the fee may participate in such enjoyment of the easement, but his use of the property in his private right is as fully excluded and the land is as completely appropriated to the use of the road as if there were no easement. The fee in the land is not as valuable to him as if it were not burdened with the street, but nevertheless it is property which cannot be taken without compensation first made or secured. If the

easement of the street should come to an end, the fee would remain burdened only by the easement of the railroad right of way, and this lays bare the fact that the private property in the street is diminished to the extent of such right of way. In such situations the entire estate is divided into two interests, the easement of the public and the fee of the private owner, and the construction and use of a railroad over it is as much a taking of the corporeal property as if there were but one interest.

"The propositions on which counsel for defendant based the argument that only a damaging and not a taking is threatened would not, if they were sound, tend to establish that conclusion, but rather the one that the taking would be rightful without compensation. Stated shortly, those propositions are that the original dedication of the land was for all the purposes of highways, and that the use of it for a railway is one of such purposes. The conclusion sought to be drawn is, not that such use without compensation is authorized as one to which the owner has consented, but that it is not a taking as distinguished from a damaging. The conclusion has no connection with the premises. If it were true that the dedication authorizes the use of the street for the purposes of commercial railroads, it would follow that such a use would be with the consent of the dedicator, and therefore to be made without compensation, but not that it would not be a taking. That such is not the effect of a dedication in this state is put beyond question by decisions of this court which hold that the construction of tracks of steam commercial railroads in streets constitutes a new servitude or burden not within the purposes of the dedication and calling for compensation. G., C. & S. F. Ry. Co. v. Eddins, 60 Tex. 656; G., C. & S. F. Ry. Co. v. Fuller, 63 Tex. 467.

"Whether the compensation is first to be made must, of course, depend upon the answer to the question whether or not there is to be a taking. Whatever may be the full meaning of the words 'property' and 'taken,' in the Constitution, there is no escape from the conclusion that the first includes the fee-simple title to the thing owned, whether it be burdened with an easement or not, and that the latter includes the appropriation of that thing, or of some interest or estate in it, by actual physical possession, such as exists when a railroad is constructed and operated upon it. G., C. & S. F. Ry. Co. v. Lyons, 2 Willson, Civ. Cas. Ct. App. § 139, and authorities cited.

"It is urged that the decisions in this state have settled the law to be otherwise, but we think not. There have been conflicting views of the subject in other jurisdictions arising mainly in determining the sense in which the word 'property' is used in the Constitution; one view being that it referred to the tangible objects owned as property, and the other that it was used in its correct legal sense to indicate the several rights of ownership recognized by law with respect to such objects. Differences as to what was essential to a taking necessarily resulted from this fundamental difference as to what was to be regarded as the property. This is fully explained in Lewis on Eminent Domain, c. 3, and the many decisions there referred to. It is alluded to also in G., C. & S. F. Ry. Co. v. Fuller, 63 Tex. 469. That which was regarded by a court entertaining the latter view as the taking away of a right of property in the thing which was the subject of ownership, as land or a chattel, for which compensation was exacted by the Constitution, was held by those entertaining the former not to be a taking of the thing or of any part of it, and therefore not to entitle to compensation under a provision exacting it only for takings, however damaging to the owner the act complained of may have been. This history of the subject should be kept in mind when construing our present Constitution.

"Several kinds of cases have arisen out of the occupation of streets by railroads: (1) Where the person seeking compensation owned the fee, as in this case; (2) where he did not own the fee, but owned lots abutting on the street with the rights of access and egress, light and air; (3) where he owned neither the fee nor abutting lots, but owned other land so situated with reference to the railroad that he suffered damages peculiar to his situation and was held entitled to compensation under the doctrine of nuisances. G., H. & W. Ry. Co. v. Hall, 78 Tex. 169, 14 S. W. 259, 9 L. R. A. 298, 22 Am. St. Rep. 42.

"To our minds it seems plain that the first class of cases falls within both views of the meaning of the words 'property' and 'taken' just noticed. There has been some difference of opinion in other jurisdictions over this proposition; but the overwhelming weight of authority is in favor of the view first stated, and there has been no contrary holding by this court.

"In view of this diversity of opinion as to the scope of the original provision in the Constitution, that in the present was so worded as to give compensation for all losses sustained by property owners for the benefit of the public in the construction of public works, whether there was a taking, or only a damaging or destruction, of property. Nearly all the actions involving its application that have appeared in this court have been brought to recover compensation, in the form of damages, and the distinction between a taking and a damaging was generally unimportant, as the damages were recoverable whether there had been the one or the other. Dicta in cases merely seeking the recovery of damages could hardly be of controlling effect on the present question, even if they went to the extent claimed for them; but we have not found in those cited even any dicta, besides one noticed below, which, properly understood, assert that that is not a taking which is sought to be prevented by the present plaintiff. The cases of that kind are so numerous that we shall not attempt to cite many of them, but shall confine our discussion to those which seem most closely to approach the true question and chiefly to be relied upon.

"The case of H. & T. C. Ry. Co. v. Odum, 53 Tex. 343, greatly relied on by the appellee, was an action of the second class above referred to, to recover damages for the location of a railroad in a street, where the fee was not in the plaintiff, but in the state. It was controlled by the Constitution of 1869, which gave compensation only for property taken. The court held that 'the regulation or enlargement of the use of the street, the property of the state, by the Legislature, is not a taking of property within the meaning of the Constitution of 1869, although the lot owner may thereby suffer incidental or consequential inconvenience.' It ought not to be necessary to say that this does not apply when the fee is in the person complaining, for then the state is not the owner of the entire estate in the soil, and the Legislature has no power to take or authorize the taking of that part of it which belongs to another.

"In G., C. & S. F. Ry. Co. v. Eddins, supra, and in other cases following it too numerous to be cited, the change wrought by the present Constitution has been pointed out, and damages caused by railroads in streets have been allowed whether resulting from takings or not; but none of the cases in this court have decided that there is not a taking of private property by the construction and use of railroads in streets where the fee is privately owned.

"In Rische v. Texas Transportation Co., 27 Tex. Civ. App. 33, 66 S. W. 324, such an opinion is expressed; but at the same time it is stated that the pleading did not properly show that the plaintiff owned the fee. The application for writ of error to this court presented an entirely different theory from any involved in this case.

"In Settegast v. H., O. L. & M. P. Ry. Co., 38 Tex. Civ. App. 623, 87 S. W. 197, the case was discussed as if it were of the second class above mentioned, in which it was claimed that there had been a taking merely because of the appropriation of a street to railroad purposes, and not because the plaintiff owned the fee in the land actually appropriated. If such a fact existed in that case, there is nothing in the opinion to show that it was relied on or called to the attention of the Court of Civil Appeals.

"In Gray v. Dallas Terminal Co., 13 Tex. Civ. App. 163, 36 S. W. 352, it is expressly shown that the lots were not invaded; and this is true also of Burton Lumber Corp. v. City of Houston et al., 45 Tex. Civ. App. 363, 101 S. W. 825, 826, stating the decision in the Settegast Case as we have explained it.

"The facts alleged by the plaintiffs in this case, in addition to their claim based on their ownership of the fee, seem to be intended to present the contention that without regard to the fee their right to the use of the street for ingress and egress, light and air, which is an incident of their ownership of abutting lots, is a right of property appurtenant to those lots, and that hence the threatened interference with that right would constitute a taking of property in the constitutional sense. This contention is in accord with the authorities holding the second view before mentioned, and with the intimation in Judge Stayton's opinion in the Fuller Case, supra. It is contrary, we think, to the Odum Case and to the opinions of the Courts of Civil Appeals in the four cases above named. If the present Constitution, like former ones, gave protection only against takings, we should be very reluctant to agree to a construction that would deny compensation. But no construction we could adopt would deny compensation; the only question being whether or not it must be made in advance. The words 'damaged or destroyed' show the purpose to secure compensation for losses not within the language previously used, and evidently were intended to include effects upon private property of public enterprises which might be held not to constitute takings. The added words are inserted, not as a construction, but as an extension of the scope of the language previously used. It is therefore reasonably certain that the first view stated above, as to what constitutes the taking of property, was assumed in the framing of the new provision, and compensation was exacted for injuries which are not regarded as takings within that view. Since the making of compensation in advance is required for takings and not for other injuries, the several words must be held to make an important distinction and not to have been used out of abundant caution only, in order to remove all doubt as to the right to compensation. Hence the word 'taken' ought not to be held to include all cases that are covered by the others, and we think the Courts of Civil Appeals have correctly held, in the four cases last above mentioned, that those kinds of injuries that result to those owning lots abutting on streets, but not owning the fee in the land in the streets from railroads thereon, are not the taking, but the damaging, of property. It is only in reference to that kind of property that the argument has force that there is no provision for condemnation. There is provision for the condemnation of land to be actually occupied by the tracks of railroads and of every estate in it. For the projectors of a public work to ascertain and, if necessary, condemn and pay for in advance land actually to be invaded in the enterprise is a simple and easy task when compared with the difficulty and uncertainty that would attend any course intended to determine in advance all the consequential damage to result to owners of property not actually touched, and this was probably the very practical reason for the distinction in the Constitu-

tion. Where the title of the lot owner embraces soil in the street to be occupied by the railroad, the statute regulating condemnations applies, and compensation can be made in one proceeding, not only for the value of the land actually occupied, but for the consequences to the remainder of the lot. But this is not true of land not to be occupied and used.

"In the Odum Case, supra, there is an intimation that the destruction of a street might be so complete as to constitute a taking of the property in abutting lots. Whether or not the exercise of the right of access and egress incident to ownership of abutting lots might be so completely prevented by uses made of streets as to constitute a taking of the lots in the sense of the present Constitution we need not now decide, since that which is here threatened is held to be a taking of those parts of the lots extending into the streets, so far as the railroad would actually occupy them, and that is enough to sustain the application for injunction.

"For the same reason it is unnecessary that we discuss the other question whether or not an action for an injunction would lie under proper circumstances to prevent the damaging of property."

As stated at the outset, there is neither pleading nor proof in the instant case that complainants in the court below, appellees here, were invested with the fee-simple title to the street or any part thereof. We are not deciding in this case any proposition of damages, whether they would properly arise, or, if so, when they would properly arise, but we are deciding only that in the sense that the word "taken" is used in the Constitution in article 1, § 17, the word "taken" does not apply where the fee-simple title has not been taken, or encroached upon in some way, in the sense that compensation must be first made before possession can be taken. As stated above, that is the real issue in this case. So far as damage is concerned, that question does not enter into this case for the purpose of the determination of the merits of the injunction. A short discussion of the dedication of streets and for what purpose, and the nature and extent of public rights, might be instructive.

Mr. Dillon in his work on Municipal Corporations, vol. 3, § 1154, used the following language:

"The power of the public or of municipal authorities representing by delegated authority the public over streets is not confined to their use for the sole purpose of travel, but they may be used for any other purposes required by the public conveniences. The uses to which streets in towns and cities may be legitimately put are greater and more numerous than with respect to ordinary roads or highways in the country. With reference to the latter, all the public requires is the easement of passage and its incidents, and hence the owner of the soil parts with this use only, retaining the soil, and by virtue of this ownership is entitled, except for the purpose of repairs, to the earth, timber, and grass growing thereon, and all minerals, quarries, and springs below the surface, and he may maintain action against those who obstruct the road or interfere with his rights therein, but with respect to streets in populous places the public convenience requires more than the mere right to pass over and upon them. They may need to be graded and brought to a level, and therefore the public or municipal authorities may not only change the surface, but cut down trees, dig up the earth, and may use it in improving the street or repair, *and may make culverts, drains and sewers upon or under the surface* [italics ours], whether the municipal corporation holds the fee of the street or not. The true doctrine, that the municipal authorities may, under the usual powers given them, do all acts appropriate or incidental to the beneficial use of the street by the public of which, when not done in an improper and negligent manner, the adjoining feeholder cannot complain; whilst, as has been pointed out above, the courts, in the consideration of questions arising from the use of the streets in a manner which is prejudicial to abutting owners, have developed a rule of law which affords just and full protection to the rights of abutters. On the other hand, a distinct tendency has been evinced to develop a correlative and enlarged view of the public rights. The courts have never regarded the public use to which streets might properly be devoted as depending upon the methods of travel and public usage generally recognized at the time when the streets were opened, or as depending on even such public usage and methods of travel as have the sanction of long-continued custom and acquiescence. The use of the streets of a city must be extended to meet new means of locomotion and in the case of subsurface structures a disposition is shown by the courts to recognize these as legitimate street uses, when designed for the public health or comfort, and the general advantage of citizens of the municipality, and not maintained primarily or exclusively for the emolument of private corporations. This extended view of proper uses of city streets is sometimes justified on the ground of an inherent difference from country highways and city streets, but other decisions seem to deny or to disregard this supposed distinction, and hold that country highways, just as city streets, may, in the discretion of the local authorities, and under statutory authority, be applied to and used for legitimate public purposes intended for the benefit of the locality, without any additional burden being imposed upon the fee thereof. But upon whatever view it may be founded, some courts have rightfully, in our judgment, held that the public usage to which a city street may be applied without imposing an additional burden or servitude upon the fee are not to be limited by arbitrary rules, but are to be extended to meet public wants and necessities occasioned, it may be, by the enlarged uses to which abutting property is devoted. Thus the Supreme Judicial Court of Massachusetts, in holding that the owner of land taken for a street, holds it subject to the right of the Legislature to authorize the city to construct a subway for local travel, and that the owner of the fee is not entitled to compensation therefor, declared that the public easement in a city includes every kind of travel and communication for the movement or transportation of persons or property which is reasonable and proper in the use of a street."

In section 1156 he uses the following language:

"Thus, although an easement may be acquired by the public, the municipal or local authorities may build a reservoir or system in the street to retain water with which to sprinkle the streets or extinguish fires. In a case in Iowa, occurred in a city where the fee of the soil in the street was in the adjoining proprietor subject to the public easement, it appeared that the city corporation built a cistern in the street underneath the surface near the line of defendant's lot, and that subsequently defendant erected a building on his lot on the line of the street, and in excavating for a cistern and foundation wall, and the taking of earth from under the sidewalk in the street, occasioned a destruction of the cistern, for which an action was brought against him by

the city, and it was held that the action could not be maintained, because, the fee of the street being in the defendant, subject to the public easement, the city had no right without his consent to construct the cistern. The court observes that subject to the public easement the owner of adjoining lots is the absolute owner of the soil in the streets, and retains an exclusive right in all minerals, quarries, springs, or water, etc., for every purpose not inconsistent with the public right of way. So far as this case affirms that a municipal corporation rightfully cannot construct a public cistern for municipal uses in a public street without the consent of the abutter holding the fee, it is directly opposed to the case from Vermont, and other cases cited, as well as to the sound and necessary principle above laid down, namely, that the city corporation may make every use of a street which reasonably conduces to the public convenience and enjoyment. It will never do, we think, to hold that a municipality invested with the control of streets and charged with the duty of preserving the public health, promoting the public welfare, and making provision to extinguish fires, may not, if it deems it expedient, construct a subterranean reservoir or sewer in the middle of the street without the assent of the opposite lot owners."

Mr. Lewis, in his work on Eminent Domain, vol. 1, § 183, uses the following language:

"Drainage is necessary for the proper construction and maintenance of highways, both in city and country. The manner in which this drainage can be best secured is solely, therefore, for the proper authorities. In the country an open drain may suffice, but in the city, where the whole surface of the street is needed for travel, a covered sewer is required, as the proper drainage of houses, lots, and cellars, and the prompt removal of the liquid refuse from dwellings are necessary to the public health, and therefore matters of public concern. The public may provide the means for such drainage and removal, and construct sewers in the streets for that purpose, but a sewer constructed through the streets of a town which is not for use of the town, or the abutting owners, but solely to carry the sewerage of an adjoining town to the sea, is an additional servitude upon the street, and cannot be built without compensation to the owners of the fee. So of a sewer on a country road to carry the sewerage of the city to a stream. The making of a drain or open ditch on the side of a street, if for the emolument of the street, is a proper use of the street for which the abutting owner has no legal ground of complaint, but the public authorities could authorize a drain to be laid in a street over the fee of others."

Mr. Elliott on Roads and Streets, vol. 1, § 555, uses the following language:

"An important use to which the streets and alleys of a city or incorporated town may be devoted is that of drainage or sewerage. It is often impossible to construct a street or road without a proper system of drainage, and the authority to construct, improve, and maintain roads and streets seems naturally to carry with it the right to construct the necessary system of drainage. In such a case it may be justly regarded as a part of the street improvement thereon. The question as to the right of a municipal corporation to construct sewers in its streets is free from doubt, but there is more difficulty upon the question of the right to place sewers in rural roads. We think that, where sewers form part of the improvement and are reasonably necessary to make the road safe and convenient for travel, they may be placed in it, but perhaps no general rule can be definitely stated upon the subject. There can be no doubt, as we think, as to the right to use suburban roads for the drainage of connecting highways or all highways forming part of a general system."

In section 560 the same writer says:

"Whether this right of municipal corporations to construct drains and sewers shall be exercised in any particular case or not, as well as the manner in which it shall be exercised, must be determined by the corporation, and not by the courts. When, however, the corporation has ordered the construction of a sewer, and has entered upon a prosecution of the work, its duty becomes administerial, and where a judicial duty ends, an administerial duty begins, there immunity ceases, and liability attaches."

In section 561 the same writer, continuing, says:

"If the necessity for a drain or sewer results from the negligent act of the corporation itself, it may be liable for not constructing the necessary drain or sewer."

There is no question whatever that the city of Port Arthur, from its situation near tidewater, and only a slight degree above the sea level, and owing to the exposure to tidal wave, must, of necessity, be protected, not only from water from the outside coming into the city, but also by the same necessity is compelled to inaugurate a system of drainage with which to carry off and take care of the surface water that falls within the limits of the levee surrounding the city.

[2] The city, realizing the necessity, has seen fit to vote for and issue bonds in quite a large sum, and has retained the services of a competent engineer for the purpose of laying out a comprehensive system of drainage, and whether the same be the most feasible or the best in all respects, and whether the system may be more or less expensive, is not a question for this court, but is peculiarly within the province of the city council for the city of Port Arthur, always recognizing the fact that the city council is, and should be, liable for the careless or negligent construction and operation of the means provided by it. We repeat here what has been said before, that we are not deciding the question of damages which might or possibly have accrued to a property owner or property owners, but we are deciding that in the sense that the Constitution inhibits the taking of private property for public use, and providing that the same shall be first paid for, or money deposited, the citizens of Port Arthur, complainants in the lower court, appellees here, should not be heard to complain. They have their recourse.

[3] The proposition of whether the cutting of the ditch on Eighth street in the manner in which the city proposed to construct it is such a nuisance as would entitle the plaintiffs or either of them to an injunction pending the determination of this suit on its merits (article 4643, Vernon's Sayles' Civ. St.) must be answered in the negative.

In the case of Ort v. Bowden, 148 S. W. 1145, the syllabus reads as follows:

"Mandatory injunction will not generally be granted until final hearing on the merits, unless on the showing of a clear right, and in case

of necessity or extreme hardship, its object being to maintain the status quo, and not to determine the right itself; so that a mandatory injunction which, in effect, anticipates the judgment or gives some relief demanded to be given by the court, will seldom be granted."

In 22 Cyc. 740, after defining preliminary injunction and discussion of the purpose of the issuance, it is said:

"The object is to maintain the status quo to maintain property in its existing condition to prevent further impending injury, but not to determine the right itself. Therefore, where the issuance of a preliminary injunction would have the effect of granting all the relief which could be obtained by a final decree, and would practically dispose of the whole case, it will not be granted."

Further on, in page 743, it is said:

"Since an injunction mandatory in its nature generally does not tend to maintain the status quo, it is generally improper to issue such an injunction prior to final hearing, and it is frequently said that such a preliminary injunction will never issue if the issuance on preliminary application of an injunction of mandatory nature will have the effect of granting to the complainant all the relief that he could obtain on final hearing, the application should be refused except on the rare occasions, and then only when the complainant's rights to relief is clear and certain."

We have gone into the proposition of what the courts decide the constitutional provision to mean with reference to the word "take" in connection with the property of the owners. The settlement of this question that this does not apply in the sense in which it is used in the Constitution to abutting owners, but only to owners of fee-simple title, practically disposes of the issues in this case with reference to payment prior to taking possession of the property. No other matter will be considered at this time. This injunction should not have been issued, and the same is in all respects dissolved, and held for naught.

The case is therefore reversed, and the injunction dissolved.

It is so ordered.